1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11 | LAMONT DUSTIN BRADSHAW,

) Case No.: 1:12-cv-01976-AWI-JLT

12 |           Petitioner,

) 
) FINDINGS AND RECOMMENDATIONS TO

13 |   v.

) DENY PETITION FOR WRIT OF HABEAS
) CORPUS (Doc. 1)

14 | R. T. C. GROUNDS,

) 
) ORDER DIRECTING THAT OBJECTIONS BE

15 |           Respondent.

) FILED WITHIN TWENTY-ONE DAYS

16 | _____ )

17       Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18 | pursuant to 28 U.S.C. § 2254.

19                          **PROCEDURAL HISTORY**

20       In 2009, a jury convicted Petitioner of conspiracy to commit murder (Pen.Code,1 §§ 182, subd

21 | (a)(1), 187, subd. (a); (count 1); conspiracy to discharge a firearm at an occupied vehicle (§§ 182, subd

22 | (a)(1), 246 (count 3); carrying a loaded firearm by an active participant in a criminal street gang (§

23 | 12031, subd. (a)(2)(C)(count 4); active participation in a criminal street gang (§ 186.22, subd. (a)

24 | (count 5); and possession of a firearm in violation of probation (§ 12021, subd. (d) (count 6). (Lodged

25 | Document ("LD") 3, pp. 1-2.  The jury acquitted Petitioner of attempted murder (count 7), and

26 | discharging a firearm at an occupied vehicle (count 8). (Id.)

27       The Kern County Superior Court sentenced him to a total term of 50 years to life for count 1,

28 | plus a consecutive term of 15 years to life for count 3. LD 3, pp. 1-2.  The terms imposed on the

1

remaining counts were stayed under California law pursuant to Penal Code section 654. (Id.).

Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed Petitioner's conviction. (LD 3).   His petition for review filed in the California Supreme Court was summarily denied.  (LD 5).

On December 4, 2012, Petitioner filed the instant petition in which he alleges that there was insufficient evidence to support his conviction.  (Doc. 1).  Respondent's answered the petition and Petitioner filed his Traverse (Doc. 12; Doc. 20).

**FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

On August 2, 2008, sometime after 2:00 a.m., Bradley Wafford, a member of the Eastside Crips, a criminal street gang, was sitting with his friend D'Ondria Jones in Wafford's Trailblazer. The vehicle was parked across the street from Jones's house, where, that night, there had been a party of between 22 and 30 people. Wafford sat in the driver's seat and Jones sat in the front passenger seat.

Before Jones crossed the street to get into Wafford's vehicle, she saw a silver Chrysler drive onto Ilene Court where her house was located. The car stopped to let her cross the street and then continued to the end of the cul-de-sac. After Jones got inside Wafford's vehicle, the Chrysler returned and pulled up next to them. Wafford recalled that a person in the Chrysler asked, "Is there a party right here?" When Wafford answered no, someone in the Chrysler fired multiple shots into his vehicle. The car then drove away.

The arrival of the Chrysler and the shooting were also witnessed by Damiris Woods. Woods, like Wafford, was a member of the Eastside Crips. When the incident occurred, Woods was getting ready to leave the party in his car, which was parked in Jones's driveway, across the street from Wafford's vehicle.

In the investigation of the shooting, police recovered seven spent .40–caliber shell casings. Forensic testing established that these casings came from a Glock .40–caliber semiautomatic pistol, which was recovered from the backyard of appellant's aunt's house a few hours after the shooting. Police also found three bullets lodged in various locations inside Wafford's vehicle.

Jones was uninjured in the shooting, but Wafford was struck in the chest and buttocks. He spent three days in the hospital. Doctors could not remove the bullet in his chest because it was too close to his heart; i.e., two inches.

At 2:35 a.m., emergency dispatch received the first call about the shooting. Around 3:00 a.m., Bakersfield Police Officer Jess Beagley stopped the silver Chrysler. The car's sole occupant was Deandre Wallace, an associate of the Westside Crips gang, a rival of the Eastside Crips.

Officer Beagley conducted a search of the Chrysler and found a digital camera in the center console. The camera contained a picture of appellant holding a Glock firearm. Based on the

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
Thus, the Court adopts the factual recitations set forth by the 5th DCA.

time stamp, the picture was estimated to have been taken between nine and 11 minutes prior to the time dispatch received the first call about the shooting.

Appellant's fingerprints were also found on the Chrysler's right rear fender and on the right front fender.

Wallace testified that, on the night of the shooting, he attended a house party, where he twice loaned out his Chrysler to people who wanted to go buy alcohol. The second time he loaned out the car, he loaned it to appellant and two others, who were gone for about an hour. When the car was returned to Wallace, appellant was not in it.

Officer Brent Stratton, who interviewed both appellant and Wallace, testified that he eventually determined that the people who reportedly borrowed Wallace's car were appellant, Billy Sanders ("Little Skeet"), and Benny West ("Little Teflon"), all three of whom were members of the Westside Crips.

Wallace told Officer Stratton that, after the Chrysler was returned to him, he overheard appellant laughing about doing a shooting.

After the shooting, police officers traced appellant to his aunt's house around 4:30 a.m. The house was located between six and eight miles from where the Chrysler was stopped, and between one and a half to two miles from where the shooting took place.

Prior to making contact with appellant, Officer Eric Lantz heard appellant talking on a cell phone behind his aunt's house, near the fence separating her property from the neighbor's property. Officer Lantz then observed appellant walk to the back door of his aunt's house. When Officer Lantz went around and knocked on the front door to the house, appellant opened it. Appellant appeared to be nervous. He was breathing heavily and repeatedly asked, "what did I do, sir?"

After detaining appellant, Officer Lantz instructed other officers to conduct a search of the residence, starting with the backyard. Officer Lantz asked appellant if he had a firearm or had discarded a firearm, explaining that he was concerned a child might find it and get injured. Appellant responded that the only gun he had was the one in the picture on the digital camera found in Wallace's Chrysler, and that the gun was currently at his friend's house.

Officer Stratton also interviewed appellant and questioned him about the gun in the picture. Appellant initially claimed that it was only an Airsoft gun and that it belonged to Wallace. But when Officer Stratton told appellant that Wallace denied owning an Airsoft gun, appellant admitted it was a real gun and claimed that it belonged to somebody known as Little Skeet (i.e., Sanders) or Little Teflon (i.e., West).

While appellant was being interviewed, officers found the Glock pistol involved in the shooting. The gun was lying about three feet from the fence in his aunt's backyard.

Appellant initially claimed that he had been at his aunt's house babysitting all night. Appellant told Officer Stratton that he arrived at her house around 8:00 p.m., and that he had been out with Wallace before that but did not see Wallace again that night. Appellant also claimed the picture of him with the gun was taken around 8:00 p.m.

After being informed that the Glock pistol had been found in his aunt's backyard, appellant changed his story and told Officer Stratton that the picture of him holding the gun was taken around 2:30 a.m., when Sanders, West, Wallace, and Sanders's girlfriend, Josonia Sterling, stopped by his aunt's house. Shortly after they left his house, they called appellant and said

3

they needed help hiding the gun. Appellant told them he could not possess it and he did not want any part of it.

In a later interview with Officer Stratton, appellant admitted that he was not at his aunt's house the entire night. According to appellant, he left his aunt's house around 1:30 a.m. and went to a party at a nearby motel. He was only there for a short time before he asked for a ride home. Appellant said he came home in Wallace's car, along with Sanders, West, and Sterling. After they left appellant at his aunt's house, he got a call from Sanders asking him to hide the gun.

Considering a hypothetical based on the facts of the case, the prosecution's gang expert opined that the shooting was committed for the benefit of appellant's gang.

**The Defense**

Appellant's cousin, Vatina Walker, testified that appellant arrived at his aunt's house sometime between 10:00 p.m. and midnight. She saw Wallace, who was driving his Chrysler, drop off appellant. To Walker's knowledge, appellant did not leave the house that night and come back. Once she saw him briefly step outside and then come back inside the house after receiving a telephone call.

Appellant's aunt, Killee Johnson, testified that appellant regularly came to her house on the weekend to help Walker babysit Johnson's and Walker's children, and that had been the plan that night. Around 11:00 p.m., when Johnson left to go to a nightclub, appellant had not yet arrived.

(LD 3, pp. 2-6).

## DISCUSSION

I.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed

4

1    by its provisions.

2        II.    Legal Standard of Review

3        A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the

4    petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was

5    contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

6    by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an

7    unreasonable determination of  the facts in light of the evidence presented in the State court

8    proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S.

9    at 412-413.

10       A state court decision is "contrary to" clearly established federal law "if it applies a rule that

11   contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

12   that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

13   Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

14       In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

15   explained that an "unreasonable application" of federal law is an objective test that turns on "whether

16   it is possible that fairminded jurists could disagree" that the state court decision meets the standards set

17   forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of

18   federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct.

19   1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court

20   "must show that the state court's ruling on the claim being presented in federal court was so lacking in

21   justification that there was an error well understood and comprehended in existing law beyond any

22   possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

23       The second prong pertains to state court decisions based on factual findings.  Davis v.

24   Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a

25   federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted

26   in a decision that was based on an unreasonable determination of the facts in light of the evidence

27   presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114

28   F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it

would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

### III.  Review of Petitioner's Claim.

The instant petition itself alleges a single claim for relief, i.e., that the prosecution presented insufficient evidence to sustain the conviction for conspiracy to commit murder and discharge of a firearm at a vehicle.

A.  Insufficiency of the Evidence.

Petitioner first contends that insufficient evidence was presented to support a conviction for conspiracy to commit murder or for the allegation that Petitioner intended to discharge a firearm at a motor vehicle.  This contention is without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Appellant contends insufficient evidence supports his conspiracy convictions because "there was no evidence appellant entered into an agreement with the intent to commit murder or with the intent to discharge a firearm at a motor vehicle." We disagree.

In reviewing the sufficiency of evidence to support a conviction, we review the entire record to determine whether there is reasonable and credible evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (People v. Hovarter (2008) 44 Cal.4th 983, 1014–1015.) We view the evidence and draw all reasonable inferences in favor of the judgment. (Id. at p. 1015.) We will uphold the judgment unless there is no substantial evidence to support the conviction under any hypothesis whatsoever. (People v. Bolin (1998) 18 Cal.4th 297, 331.)

A conspiracy conviction requires proof of the following four elements: "(1) an agreement

6

between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy. [Citations.]" (People v. Vu (2006) 143 Cal.App.4th 1009, 1024.)

" 'In proving a conspiracy, ... it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan. The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. Therefore, conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' [Citation.] 'The agreement in a conspiracy may be shown by ... conduct of the defendants in mutually carrying out an activity which constitutes a crime.' [Citations.]" (People v. Gonzalez (2004) 116 Cal.App.4th 1405, 1417; overruled on other grounds in People v. Arias (2008) 45 Cal.4th 169, 182.)

Here, the evidence permits the following reasonable inferences. On the night of the shooting, appellant was one of three Westside Crips gang members to set out in a Chrysler borrowed from an associate of the gang. They drove into a residential cul-de-sac, where there had been a house party that night attended by at least two members of the rival Eastside Crips gang. After driving by the house, the Chrysler turned around and pulled up next to a vehicle occupied by an Eastside Crips gang member and his female companion. One of the Westside Crips briefly asked the Eastside Crip if there was a party there. When he answered no, one of the Westside Crips fired a semiautomatic Glock pistol multiple times into the Eastside Crip's vehicle and at a vulnerable part of the Eastside Crip's body. A bullet entered his chest and fortuitously missed his heart by two inches. After the shooting, police recovered a digital camera from the Chrysler. The camera contained a picture, taken near the time of the shooting, which showed appellant posing with a Glock firearm. The gang associate that loaned his Chrysler to appellant and the others reported that, when the car was returned to him, he overheard appellant laughing about doing a shooting. The actual Glock pistol used in the shooting was recovered from the backyard of appellant's aunt's house, where appellant was heard talking on the phone when the police arrived. Notwithstanding appellant's assertions to the contrary, there was ample circumstantial evidence to establish that he and his fellow gang members formed a tacit agreement to commit murder and to discharge a firearm at an occupied vehicle.

We also reject appellant's assertion that "the fact he was not present supports his claim that he had no knowledge and/or did not have the specific intent to commit the offenses which were the objects of the conspiracy." The circumstances outlined above permit a reasonable inference that appellant was, in fact, present in the Chrysler at the time of the shooting. The fact the jury acquitted him of attempted murder (count 7) and personally discharging a firearm at an occupied vehicle (count 8) does not necessarily reflect that he was not present at the time of the shooting, as he suggests on appeal. The jury might simply have found there was not enough evidence to determine whether appellant was the actual shooter as alleged by the prosecution. In other words, appellant's acquittal on counts 7 and 8 does not negate the evidence supporting the conspiracy convictions, which was sufficient to show he entered an agreement to commit the target offenses with the requisite intent.

(LD 3, pp. 6-8).

2. Federal Standard.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

7

1   "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

2   of fact could have found the essential elements of the crime beyond a reasonable doubt." Id., 443 U.S.

3   at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact"

4   could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.

5   Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at

6   324, n. 16.

7           A federal court reviewing collaterally a state court conviction does not determine whether it is

8   satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335,

9   338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the

10  light most favorable to the prosecution, any rational trier of fact could have found the essential

11  elements of the crimes beyond a reasonable doubt.'" See id., quoting Jackson, 443 U.S. at 319. Only

12  where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ

13  be granted. See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

14          Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

15  conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). However, mere suspicion and

16  speculation cannot support logical inferences. Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-

17  1279 (9th Cir. 2005) (only speculation supported conviction for first degree murder under theory of

18  aiding and abetting).

19          After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson

20  with an additional layer of deference. Juan H., 408 F.3d at 1274. Generally, a federal habeas court

21  must ask whether the operative state court decision reflected an unreasonable application of Jackson

22  and Winship to the facts of the case. Id. at 1275. Moreover, in applying the AEDPA's deferential

23  standard of review, this Court must also presume the correctness of the state court's factual findings.

24  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986). This

25  presumption of correctness applies to state appellate determinations of fact as well as those of the state

26  trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of

27  correctness does not apply to state court determinations of legal questions or mixed questions of law

28  and fact, the facts as found by the state court underlying those determinations are entitled to the

presumption.  Sumner v. Mata, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

In Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting Jackson

> makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Cavazos, 132 S.Ct. at 3.

> "Jackson says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  443 U.S., at 319, 99 S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

Id. at 6. [2]

       3.  Analysis.

The state court's analysis begins with an observation that, in order to prove a conspiracy, no actual meeting to agree need take place.  Rather, it is sufficient if the evidence supports an inference that the parties "positively or tacitly came to a mutual understanding to commit a crime."  (LD 3, p. 7).  To support such inferences, the state court explained, circumstantial evidence "inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy" could be employed.  (Id.).

The appellate court then noted the reasonable inferences could be drawn from the evidence

---

[2] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the sufficiency claims herein, it should be noted that the California Supreme Court long ago expressly adopted the federal Jackson standard for sufficiency claims in state criminal proceedings.  People v. Johnson, 26 Cal.3d 557, 576 (1980).  Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

presented at trial: that Petitioner and two other gang members borrowed a Chrysler automobile from another gang member and drove to a house where a party attended by rival gang members was underway; Petitioner and the other two conspirators drove up to a car occupied by a rival gang member and a female; after a brief discussion, individuals in the Chrysler began shooting into the car of the rival gang member; one bullet barely missed the victim's heart; a camera in the Chrysler showed a recently-taken photograph of Petitioner holding a Glock handgun; when the conspirators returned the Chrysler to its owner, the owner heard Petitioner boasting about a shooting; and the Glock was recovered from Petitioner's aunt's house, where Petitioner had been talking on the phone when police arrived. (LD 3, pp. 7-8).

From the foregoing, the 5th DCA concluded that those reasonable inferences from the evidence at trial were sufficient to support a finding that Petitioner was guilty of conspiracy to commit murder and discharging a firearm at an occupied vehicle. The state court went on to point out the fact that the jury acquitted Petitioner of attempted murder and personally discharging a firearm at an occupied vehicle did not reflect that the jury had found Petitioner was not present, but suggested merely the jury found the evidence did not establish beyond a reasonable doubt that Petitioner was the actual shooter. (Id.). As the court noted, however, the fact the jury may have believed the prosecution did not prove beyond a reasonable doubt that Petitioner was the shooter did not, in any way, foreclose a jury determination that Petitioner had engaged in a conspiracy to commit attempted murder and to shoot at an occupied vehicle. (Id.).

Additionally, Respondent points to the following evidence supporting Petitioner's conviction: the weapon used in the crime was emptied of all 14 rounds when recovered and seven shots were fired at both victims; the jury made special findings of overt acts that Petitioner and the other gang members got into the Chrysler, drove to the location of the crime, that one conspirator shot a firearm into the truck hitting the rival gang member; that Petitioner discarded the firearm; and that the crime was committed for the benefit of a criminal street gang. (Doc. 12, p. 18). Moreover, Petitioner himself conceded that "prior to the shooting [he] was inside the vehicle holding a Glock." (Doc. 1, p. 17).

Finally, the Court's review of the trial evidence recounted in the 5th DCA's opinion, shows that, when confronted by officers at his aunt's house shortly after the shooting, Petitioner denied having the

10

Glock, which was later found on the premises, and also changed his story several times regarding his whereabouts that evening.  (LD 3, p. 7).  Even Petitioner's aunt testified that, although Petitioner was in the habit of babysitting at her house on the weekends, he had not arrived at 11 p.m. when the aunt left the home.  (Id.).

When considered in the aggregate, the above-cited evidence and reasonable inferences drawn therefrom are more than sufficient to support a finding that Petitioner entered into an agreement with the other two gang member-conspirators to commit the attempted murder and the act of shooting into an occupied vehicle.  Indeed, absent Petitioner's outright confession or video camera footage of Petitioner showing him in the act of shooting, it is difficult to envision how much more substantial the evidence of guilt could be.  Given the relatively low threshold to be met on review of sufficiency of the evidence claims in habeas cases, this is not a close call.  Accordingly, the state court's adjudication was neither contrary to nor an unreasonable application of clearly established federal law.  Hence, the petition should be denied with prejudice.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 21 days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).

///
///
///
///

11

1    The parties are advised that failure to file objections within the specified time may waive the

2    right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3

4    IT IS SO ORDERED.

5    Dated:   **April 8, 2015**                            **/s/ Jennifer L. Thurston**

6                                                UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28